AO 109 (Rev. 11/13) Warrant to Seize Property Subject to Forfeiture

# United States District Court
### for the
### District of Arizona

| | | |
|---|---|---|
| In the Matter of the Seizure of:<br>*(Briefly describe the property to be seized)* | ) | Case No. |
| | ) | 22-011 MB |
| | ) | |
| The contents of National Bank of Arizona, account<br>number 5799573869 | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the District of Arizona be seized as being subject to forfeiture to the United States of America. The property is described as follows:

The contents of National Bank of Arizona, account number 5799573869

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before January 19, 2022
*(not to exceed 14 days)*

❑ in daytime - 6:00 a.m. to 10:00 p.m.     ❑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to any United States Judge on criminal duty in Arizona.

N/A   ❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be search or seized *(check the appropriate box)*

❑ for ___ days *(not to exceed 30).* ❑ until the facts justifying, the later specific date of _____

Date and time issued:  1/5/2022 @ 1pm     _____
                                             *Judge's signature*

City and State:  Phoenix, AZ                Honorable Michelle H. Burns, U.S. Magistrate Judge
                                             *Printed name and title*

AO 108 (Rev. 06/09) Application for a Warrant to Seize Personal Property Subject to Forfeiture

# United States District Court
### for the
### District of Arizona

| | | |
|---|---|---|
| In the Matter of the Seizure of: | ) | Case No. |
| *(Briefly describe the property to be seized)* | ) | |
| | ) | 22-011 MB |
| The contents of National Bank of Arizona, account number 5799573869. | ) | |
| | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

    I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe the following property in the District of Arizona is (a) property, real or personal, which constitutes or is derived from proceeds traceable to a specific unlawful activity including but not limited to 18 U.S.C. § 1343 (Wire Fraud); and property, real or personal, involved in a transaction or attempted transaction in violation 18 U.S.C. § 1956 and/or 1957 (Money Laundering); (b) subject to seizure pursuant to 18 U.S.C. §§ 981(b) and 982(b)(1), and 21 U.S.C. § 853(e) and (f); and (c) subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and 982(a)(1) and 28 U.S.C. § 2461. *(describe the property):*

The contents of National Bank of Arizona, account number 5799573869

The application is based on these facts:

See the Affidavit of Internal Revenue Service Criminal Investigation (IRS-CI) Special Agent Todd Spencer

    ❑ Continued on the attached sheet.

*Todd Spencer*
_____
*Applicant's signature*

MARK WENKER  Digitally signed by MARK WENKER Date: 2022.01.04 16:38:09 -07'00'

Approved by AUSA Mark J. Wenker

Todd Spencer, Special Agent, Affiant
*Printed name and title*

Sworn to telephonically.

Date: _January 5, 2022_____

*Judge's signature*

City and State:  Phoenix, Arizona_____

Honorable Michelle H. Burns, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

Your affiant, Todd Spencer, a Special Agent with Internal Revenue Service Criminal Investigation (IRS-CI), having been duly sworn, deposes and states as follows:

### INTRODUCTION

1.     Your Affiant is submitting this affidavit in support of application for seizure warrant for the following property:

**National Bank of Arizona business account 5799573869 in the name MuveMusic LLC**

("NBA 3869"; the "Account").

2.     Probable cause exists to believe that the Account (a) is property, real or personal, which constitutes or is derived from proceeds traceable to a specific unlawful activity, including 18 U.S.C. § 1343 (Wire Fraud), and is property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957 (Money Laundering); (b) is subject to seizure pursuant to 18 U.S.C. §§ 981(b)(1) and 21 U.S.C. § 853(e) and (f); and (c) is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and 982(a)(1) and 28 U.S.C. § 2461.

### BACKGROUND INFORMATION

3.     Your affiant is a Special Agent with the Internal Revenue Service Criminal Investigation and has been since January 2001. As a Special Agent, my duties and responsibilities include investigations of individuals and business entities which have allegedly violated Federal criminal laws of the United States Code including Title 26 (Internal Revenue), Title 18 (Money Laundering and other Federal crimes), and Title 31 (Bank Secrecy Act). I have obtained a Bachelor

1

of Science degree in Accounting from the University of Arizona. While employed with IRS-CI, I have attended the Criminal Investigator Training Program and the IRS Special Agent Basic Training at the Federal Law Enforcement Training Center, which included detailed training in conducting financial investigations. I have also received training in the laws related to searches and seizures under the Fourth Amendment and the execution of search warrants. In my capacity as a Special Agent with IRS-CI, I am authorized by rule 41(a), Federal Rules of Criminal Procedure to make application for search and seizure warrants and server arrest warrants pursuant to Rule 4(a) and (d)(1), Federal rules of Criminal Procedure.

## CRIMINAL INVESTIGATION AND PROBABLE CAUSE

4.     Detailed below is a summary of the criminal investigation regarding the efforts of Webster Batista Fernandez (BATISTA) and Jose Medina Teran (TERAN) to monetize music that they have no lawful rights to monetize or otherwise control.  On November 16, 2021, BATISTA and TERAN were indicted in the United States District Court, District of Arizona, *United States v. Webster Batista Fernandez and Jose Teran*, CR 21-00955-PHX-DLR (MTM).  Prior to arresting the defendants, the government obtained and executed several seizure warrants (21-3243MB, 21-3244MB, 21-3245MB, 21-3246MB) for multiple bank accounts and vehicles.  I recently learned that NBA 3869 also is subject to seizure and forfeiture as it contains the proceeds of defendants' indicted offenses.

5.     Beginning in 2016, BATISTA partnered with TERAN and together they fraudulently claimed to have legal rights, control, and/or ownership over a wide swath of musical artists.   BATISTA and TERAN then made false representations to YouTube and other social media platforms, either directly or indirectly through an intermediary company, that one of their companies had the legal rights, control, and/or ownership over a large volume of primarily Latin

American music.  To date, investigators have not uncovered any evidence to support BATISTA and TERAN's vast claims of ownership over tens of thousands of songs.  As a result, since as early as 2016, BATISTA, TERAN, and other co-conspirators have been reaping royalty payments without any legal basis to do so.  Based upon subpoenaed records obtained throughout this investigation, for the period of April 30, 2016 to May 31, 2021, BATISTA and/or one of his entities received music-based royalties over $20.7 million.

6.     In   particular,   this   investigation   currently   involves   the   following individuals/entities:

    a)  BATISTA as an individual and in his capacity as the President of Musika Inc LLC, CEO of MediaMuv LLC, member and statutory agent of Elegre Records LLC, member of VA Music Inc.

    b)  TERAN, an individual, is the registered agent and manager of Musika Inc LLC, a member and statutory agent of VA Music Inc, a member of MediaMuv LLC, and the owner of MuveMusic LLC.

    c)  Omeida 'Yadi' Batista ("OMEIDA") is the separated spouse of BATISTA, a member and statutory agent of MediaMuv LLC, and a listed member of Elegre Records LLC.

    d)  Loris Cleaning LLC (Loris Cleaning") is a nominee entity controlled by W. BATISTA and an entity through which millions of royalty payments are being funneled.

7.     In August of 2019, I conducted an interview with OMEIDA.  During this interview, she explained that Elegre Records, which does business as "MediaMuv," is a marketing company that makes money by obtaining music-based royalties from YouTube and Google.  According to

her, the company did so "through a company called AdRep" and that Elegre had contracts with musicians and YouTubers who want to be on the YouTube platform. OMEIDA further explained that Elegre made money by attaching advertisements to the videos it placed on YouTube and by receiving royalties for the content that it was playing on YouTube. Finally, OMEIDA stated that Elegre Records is BATISTA's company, but everything was under her name because BATISTA does not have legal status in the United States.

8.      In addition to meeting with OMEIDA, I also conducted an interview with TERAN on October 31, 2019. TERAN confirmed that Elegre Records was in the business of collecting royalties on music played through media platforms such as YouTube, among others, and that OMEIDA and BATISTA were the owners, but that as of 2019, Elegre Records no longer existed. TERAN also confirmed that BATISTA controlled all the operations of the business and that it was formally registered in wife's name.

9.      TERAN explained that he previously conducted business under the name VA Music LLC, which represented regional Mexican artists and organizations, but that VA Music LLC eventually became a client of Elegre Records in 2016-2017. According to TERAN, he had a new entity, MuveMusic LLC, that was taking over for VA Music LLC. TERAN confirmed that he and BATISTA worked at Elegre Records "like partners" in regard to new clientele but BATISTA handled all financial responsibilities and "ran the operation."

**AdRev Partners with MediaMuv to Obtain Royalty Payments via YouTube**

10.     Based upon OMEIDA's reference to "AdRep" and subsequent investigative efforts, I discovered that the company she referred to is called "AdRev," a division of AudioMicro Inc, and is an entity that administers YouTube royalty payments and makes disbursements to those who claim to own music assets. According to information obtained from AdRev, AdRev paid

4

royalty payments to MediaMuv in the amount of $17.8 million for the years 2016 through March 31, 2020.[1]

11.     It appears that in April of 2017, MediaMuv LLC signed an administrative agreement with AdRev.  An individual named "Jose Medina Segura" signed the contract as the CEO for MediaMuv LLC, indicating an email address of jmedina@mediamuv.com.  During our meeting, TERAN admitted to using the email address jmedina@mediamuv.com, but claimed that Jose Medina Segura is a music producer with a huge catalog of musical artists, whom TERAN described as a "shark in the Mexican business."  TERAN also said that Segura was a client of Elegre Records, and that Elegre Records generated YouTube income for Segura.  But as to MediaMuv's contract with AdRev, TERAN said that he did not know why Jose Medina Segura was listed as the MediaMuv CEO.  Despite extensive research, especially in relation to Mexican music artists and entities, I was unable to locate anyone involved in the Mexican music industry with the name Jose Medina Segura.

12.     As to its contract with AdRev, MediaMuv LLC represented and warrantied that it "(iii) is the writer, author, publisher, copyright holder, and creator of the Content or has obtained and currently holds valid and sufficient rights, including the rights under copyrights to enter into this Agreement."  AdRev was then responsible for policing and monetizing the content MediaMuv claimed to own on YouTube and was then responsible for making the royalty payments from YouTube to MediaMuv.  For instance, AdRev administered a YouTube content management system ("CMS") on behalf of MediaMuv, which involved the "manual claiming . . . and

---

[1] Royalty payments from AdRev subsequent to March 31, 2020 have not been obtained as further investigation into AdRev is underway.

monetization of YouTube videos that make use of [MediaMuv]'s Content and which are not automatically claimed and monetized . . . within the YouTube CMS."

13.     In practice, AdRev was responsible for migrating MediaMuv's entire music catalog to YouTube's content management system ("CMS"), where AdRev would then enforce MediaMuv's purported claims to ownership.  For instance, on April 24, 2017, MediaMuv LLC Representative, Jennifer Parker (contact@mediamuv.com) responded to an email from Andrew Korn, AdRev VP - Operations, regarding OMEIDA's desire for Jennifer Parker to connect with someone at AdRev as they were going to be migrating MediaMuv's catalog to YouTube's content management system.  According to Andrew Korn, Noah Becker (who was cc'd on the email) had directed him to coordinate the effort to upload all of MediaMuv's content and to work with YouTube in doing so.

14.     A few weeks later, on May 4, 2017, AdRev CEO Noah Becker and AdRev VP - Operations Andrew Korn attempted to get YouTube to automatically confirm MediaMuv's ownership of its entire music catalog, more than 37,000 songs.  During communications with YouTube employees, Andrew Korn requested that YouTube confirm MediaMuv's ownership in bulk because manually inputting 37,0000 claims of ownership was too onerous.

15.     That same day, on May 4, 2017, Jeff Flanagan from MediaMuv (using the email address copyright@mediamuv.com) sent a dropbox link to AdRev including updated ISRCs (International Standard Recording Code – a unique code used to identify sound recordings and music video recordings).

16.     After entering into their contract and migrating MediaMuv's music library to YouTube, AdRev provided regular royalty payments to MediaMuv.  Indeed, on March 4, 2018, jmedina@mediamuv.com sent a Form W-9 via email to AdRev requesting a Form 1099-Misc be

issued so that MediaMuv could complete its taxes. On March 12, 2018, AdRev responded via email and issued a 2017 Form 1099-MISC for $4,156,468.14 in the name of OMEIDA BATISTA. AdRev later issued a revised 2017 Form 1099-MISC to OMEIDA BATISTA in the amount of $3,556,386.19.

17.     The next year, AdRev issued a 2018 Form 1099-Misc for $5,501,359.33 in the name of OMEIDA BATISTA/Elegre Records LLC, but subsequently corrected the 2018 Form 1099-Misc by issuing $5,072,494 in OMEIDA BATISTA's name alone.

18.     Similarly, in May of 2019, AdRev sent an email to Jose Medina, jmedina@mediamuv.com asking him to confirm whether the Form W-9 information for tax filing reporting should remain in BATISTA's name.  In response, on August 23, 2019, AdRev received an updated Form W-9 directing AdRev to report payments to Jose Medina, doing business as MuveMusic LLC.  This Form was signed electronically by TERAN and dated 08/23/2019.  As a result, the 2019 Form 1099-Misc that AdRev subsequently filed reported the recipient as Jose Medina for a sum of $6,054,214.

19.     An analysis of the 30 highest grossing artists whose royalties were paid out from AdRev to MediaMuv LLC and MuveMusic LLC indicates that not a single one of the top-30 grossing artists has received any money:

| ARTIST | Royalty Payments From AdRev to MediaMuv (2016-Qtr 1 of 2020) | Payments that MediaMuv, Elegre Records, and/or MuveMusic Made to Artist | Likely Location of Artist |
|---|---|---|---|
| J.L.P. | $132,702.45 | $0.00 | Spain |

| | | | |
|---|---|---|---|
| L.C. | $128,339.65 | $0.00 | United States |
| C.P. | $102,626.84 | $0.00 | Mexico |
| G.L. | $101,289.09 | $0.00 | Mexico |
| E.P. | $87,651.36 | $0.00 | Colombia |
| V.C. | $87,073.90 | $0.00 | Mexico |
| G.J. | $86,594.97 | $0.00 | Mexico |
| N.R. | $85,850.19 | $0.00 | Mexico |
| H.A. | $81,138.79 | $0.00 | Dominican Republic |
| R. | $78,667.47 | $0.00 | Colombia |
| Z.F. | $78,664.79 | $0.00 | Dominican Republic |
| V.E. | $78,504.93 | $0.00 | Deceased |
| A.M. | $77,412.82 | $0.00 | Deceased |
| T.D.L.S. | $71,755.62 | $0.00 | Mexico |
| E.M. | $71,076.88 | $0.00 | Dominican Republic |
| G.B. | $68,995.53 | $0.00 | Mexico |

| G.M. | $66,544.97 | $0.00 | Mexico |
|---|---|---|---|
| L.D.D.T. | $65,453.65 | $0.00 | Mexico |
| L.I.D.N. | $56,127.42 | $0.00 | Mexico |
| G.L. | $55,396.12 | $0.00 | Mexico |
| M.H. | $51,474.76 | $0.00 | Colombia |
| C.G. | $49,550.46 | $0.00 | Mexico |
| L.R. | $49,168.81 | $0.00 | Unknown |
| R.A. | $48,453.66 | $0.00 | Unknown |
| L.A. | $42,573.24 | $0.00 | Mexico |
| G.N. | $37,696.78 | $0.00 | Colombia |
| L.A. | $33,847.50 | $0.00 | Mexico |
| A. | $27,347.83 | $0.00 | Colombia |
| S. | $26,015.88 | $0.00 | United States |

20.     Several of these artists and/or their representatives have told investigators that they have no knowledge of BATISTA, TERAN, MediaMuv, Elegre Records, or AdRev.  For instance, on January 22, 2020, E.C., a legal representative for musician J.L.P. (number one on the above

list), informed investigators that J.L.P. "has no contact with or even knowledge of Elegre Records" and that J.L.P. instead "has an agreement with Sound Exchange and will probably become a member of ASCAP soon."   Later that year, on December 9, 2020, the legal representative for J.L.P. again told investigators that neither the companies MediaMuv, Elegre Records, Musika, VA Music nor the individuals BATISTA, TERAN, or OMEIDA have any relationship with J.L.P. Additionally, J.L.P's legal representative was not aware of the company AdRev nor was the representative aware of receiving any royalty payments from AdRev, MediaMuv, or any other related entity.

21.     Likewise, on April 7, 2020, J.C.F., an attorney for the band L.C. (number two on the above list), informed investigators that L.C. "has neither collected any royalty from YouTube, nor authorized another to do so." In a subsequent conversation, on December 9, 2020, both the legal representative E.B., and leader/founding member of L.C., A.R., told investigators via teleconference that L.C. does not have any legal relationship with MediaMuv, Musika, Elegre Records, VA Music, BATISTA, TERAN, OMEIDA or anyone other person or entity associated with them or their related entities.  Moreover, both E.B. and A.R. reviewed a list of L.C.'s songs, which MediaMuv has collected royalties for, and confirmed that A.R. has copyrights to those songs, not MediaMuv.

22.     On April 7, 2020, the band G.M. (number 17 on the above list) also explained to investigators that they do not know MediaMuv and do not have any agreement or contract with them.  Instead, G.M. claimed to have an agreement with Fonovisa Records regarding their music rights.  This was confirmed by a representative for Fonovisa Records, J.E., who stated that he does not know MediaMuv.

23.     On or about April 20, 2020, E.T.G., a legal representative for band V.C. (number six on the above list), also told investigators that they do not have any relationship with MediaMuv, Elegre Records, BATISTA, TERAN, or OMEIDA.

24.     On February 7, 2020, I spoke with A.G., who handles digital marketing for the artist Z.F. (number 11 on the above list), regarding Z.F.'s music rights.  A.G. explained that he was familiar with BATISTA, and that BATISTA had an arrangement to monetize YouTube plays on four of Z.F.'s songs, but BATISTA was monetizing more than the four agreed upon songs.  Instead, BATISTA was monetizing a broader set of Z.F.'s songs without permission and had been doing so for approximately two years.  And while Z.F. did receive some money from BATISTA, a financial analysis of the YouTube royalties that AdRev paid to BATISTA/TERAN and their related entities indicates that AdRev provided MediaMuv/Elegre Records with $76,139.82 in royalty payments for the years 2017 and 2018.  Despite this, there is currently no evidence of any payments from MediaMuv/Elegre Records to Z.F.—indeed, there is only evidence of two deposits from Z.F. to Elegre in the amount of $13,500 during the fall of 2016.

25.     On November 24, 2020, the band A. (number 29 on the above list) informed investigators that they too have never heard of, or had any business dealings with, BATISTA, OMEIDA, MediaMuv, Elegre Records, or TERAN.  According to the band, A. writes its own songs, composes its own music, and is represented by the Warner Chapel music label.  Moreover, A. said that the company "YT Rocker" manages the band's songs on YouTube, not AdRev.  On December 9, 2020, the manager of YT Rocker, P.A., informed investigators that the band A. is one of his clients and that he also has never heard of BATISTA, OMEIDA, Elegre Records, or TERAN, but he has heard of MediaMuv.  Indeed, P.A. said MediaMuv was illegally claiming YouTube royalty rights on several of YT Rocker's new artists.  Although he has never spoken with

11

anyone at MediaMuv, P.A. said that whenever he learns that MediaMuv is claiming the royalties of one of his clients on YouTube, he contacts Google and that Google then has MediaMuv removed from the royalty rights for any of the artists that YT Rocker has under contract.

26.     On September 11, 2020, music producer and singer, Jose Juan Segura Padilla doing business as El Padrino Records (not named in the list above), told investigators that he contracted with MediaMuv to monetize music on YouTube.  El Padrino Records provided a list of 10 artists for which he claimed to own music copyrights: E.T.P., L.C.S., D.D.L.S., T.T., A.D.S., E.C.C., L.P.C., S.D.S., G.D.C., and L.A.D.L.S.  An analysis of AdRev royalty payments (through March 30, 2021), revealed MediaMuv earned royalties of $33,386.61 on songs by these ten El Padrino Records represented artists.  This total represents a mere 0.2% of the total $17.8 million that MediaMuv received in royalties from 2016 through March 31, 2020.  El Padrino Records is the only confirmed customer of MediaMuv.  However, payments from MediaMuv to Jose Juan Segura and/or El Padrino Records suggest more than a client relationship.  In a straight business relationship, it would be expected MediaMuv would retain a percentage of the $33,386.91 in royalty payments earned from El Padrino Records as a fee and return the majority to El Padrino Records.  Bank analysis shows that Jose Juan Segura Padilla and/or El Padrino Records received the following:

| From | Total Amount | Period of Payments |
|------|-------------|-------------------|
| Elegre Records LLC | $175,699 | 10/2016 – 01/2019 |
| Eniel Gaetan Hernandez | $8,592 | 05/2018 |
| Lori's Cleaning LLC | $35,065 | 03/2019 – 07/2019 |
| MuveMusic LLC | $113,595 | 09/2019 – 5/2021 |

| | | |
|---|---|---|
| VA Music LLC[2] | $29,544 | 03/2020 – 07/2020 |
| Xpace World Music Corp | $5,500 | 10/2020 |
| Combined | $367,995 | |

27.     MediaMuv/TERAN/BATISTA and others have routinely represented to AdRev and to YouTube administrators that they have the necessary rights and contracts enabling them to collect royalty payments.

28.     AdRev was responsible for paying to MediaMuv, or one of its nominee entities, the royalty payments received from YouTube.  For instance, on or about April 28, 2018, AdRev's CFO, Peter Amloian received an email from jmedina@mediamuv.com requesting that bank account information for future deposits be updated to "Eniel Gaetan Hernandez," at Bank of America account xxxxxxx7569.  The email was signed by Jennifer Parker, Billing Department, MediaMuv LLC.  Peter Amloian, VP-Finance of AdRev, confirmed the update on April 25, 2018. Five days later, on or about April 30, 2018, a deposit of $314,308.01 was sent from AdRev to the Eniel Gaetan Hernandez Bank of America account xxxxxxx7569.

29.     Then, on May 23, 2018, Jose Medina—using the email signature "MediaMuv LLC CEO"—used the email address jmedina@mediamuv.com to request the bank account information be changed back to their old account: Elegre Records LLC, Bank of America account xxxxxx2321. Peter Amloain confirmed the update on May 23, 2018.  And on or about May 31, 2018, a deposit of $374,726.38 was sent from AdRev to the Elegre Records LLC, Bank of America account xxxxxx2321.

---

[2] Payments from VA Music LLC were made directly to El Padrino Records artist T.T.

30.     On or about February 11, 2019, after an exchange of text messages, Jose Medina used the email account jmedina@mediamuv.com to send an email to AdRev CFO, Peter Amloian requesting that bank account information for future deposits be updated to: Loris Cleaning LLC, Bank of America account xxxxxxx3973.  On or about February 28, 2019, AdRev sent a deposit of $470,675.58 to the Loris Cleaning LLC, Bank of America account xxxxxxx3973.

31.     On or about August 22, 2019, the email address jmedina@mediamuv sent another an email to Peter Amloian explaining that "MediaMuv is making new changes, the accounting is gonna be handle by another department, also our new accountant is requesting the change of bank because we're having a lot of issues using the payroll system with the current bank, please update the new information on your end thank you. . . . Chase Bank account xxxxx7351 in the name of MuveMusic LLC."  On or about September 30, 2019, AdRev sent a deposit of $607,752.08 to the MuveMusic LLC, Chase 527767351 (hereinafter Chase 7351).

32.     From 2016 through May 31, 2021, bank records show a constant transfer of funds between entity and individual accounts.  Of approximately $8.7 million of AdRev deposits to Elegre Records LLC Bank of America account xxxxxx2321, approximately $762,000 went to Eniel Gaetan Hernandez; $1.2 million to TERAN and his entity VA Music LLC; $1.5 million to Lori's Cleaning LLC, and approximately $943,000 to OMEIDA from 2016 to January 2019.

33.     Of approximately $2.6 million of AdRev deposits to Lori's Cleaning LLC Bank of America account xxxxxxx3973, approximately $400,000 went to Eniel Gaetan Hernandez; $651,000 to TERAN and/or VA Music LLC; and approximately $105,000 to OMEIDA from February 2019 to July 2019.

34.     Of approximately $9.1 million of AdRev deposits to MuveMusic LLC Chase 7351, approximately $3.6 million went to Xpace World Music LLC and $2.56 million to TERAN and/or VA Music LLC.

35.     On November 2, 2021, seizure warrants for funds held in accounts at JPMorgan Chase under the name MuveMusic LLC were served.  Although the entire balance of the accounts was seized, the accounts remained open.  On November 16, 2021, a federal grand jury in the District of Arizona indicted BATISTA and TERAN on charges related to the above described fraud.  On November 30, 2021, AdRev direct deposited $285,344.43 to MuveMusic LLC's Chase 7351 account.  That same day, November 30, 2021, the MuveMusic LLC Chase 7351 account was emptied.  A Chase cashier's check for $191,449.63, made payable to Jose M. Medina Teran, was issued.  That check was subsequently deposited to newly opened business account at National Bank of Arizona, account number 5799573869.

**NBA 3869 Contain Fraud Proceeds**

36.     According to information provided by National Bank of Arizona, Jose M. Teran opened NBA 3869 on November 30, 2021 in the name MuveMusic LLC.

37.     Based on an analysis for deposits into Chase Account 7351, 92% of the deposits to Chase 7351 were from AdRev.  Deposits from AdRev totaled $9,154,080.12.  The vast majority of the deposits into Chase 7351 from AdRev are proceeds of BATISTA and his coconspirators' fraud scheme; therefore, the cashier's check withdrawal from Chase 7351 and subsequent deposit to NBA 3869 is also proceeds of BATISTA and his coconspirators' fraud scheme.

38.     Probable cause exists to believe that funds in NBA 3869 are traceable to the proceeds of the fraud scheme described above.

15

## CONCLUSION

39.     Based on my training and experience and the information provided in this affidavit, probable cause exists to believe that NBA 3869 (a) is property, real or personal, which constitutes or is derived from proceeds traceable to a specific unlawful activity, including 18 U.S.C. § 1343 (Wire Fraud), and is property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957 (Money Laundering); (b) is subject to seizure pursuant to 18 U.S.C. §§ 981(b)(1) and 21 U.S.C. § 853(e) and (f); and (c) is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and 982(a)(1) and 28 U.S.C. § 2461.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

_Todd Spencer_
_____
Todd Spencer, Special Agent
Internal Revenue Service Criminal     Investigation
Phoenix, Arizona

X Sworn by Telephone

SUBSCRIBED AND SWORN to telephonically January 5, 2022.

_____
Honorable Michelle H. Burns
United States Magistrate Judge

16